UNITED STATES of America

v.

Christopher Charles CLARKE, Appellant,

And Consolidated Case Nos.
91–3321 and 91–3323.

No. 91–3313.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 16, 1993.

Decided May 20, 1994.

A.J. Kramer, Federal Public Defender, argued the cause and filed the briefs, for appellant Clarke. He also filed the joint brief of statement for jurisdiction, case, and facts for appellants Clarke, Barden, and Cunningham.

James C. Savage, Rockville, MD, (appointed by the Court) argued the cause and filed the brief, for appellant Barden.

Andrew J.J. Delehanty, Washington, DC, (appointed by the Court) argued the cause and filed the brief, for appellant Cunningham.

Michael D. Brittin, Asst. U.S. Atty., argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., and John R. Fisher and Mark J. Ehlers, Asst. U.S. Attys.

Before: SENTELLE and RANDOLPH, Circuit Judges; and CAMPBELL,* Senior Circuit Judge, United States Court of Appeals for the First Circuit.

Opinion for the Court filed by Senior Circuit Judge CAMPBELL.

LEVIN H. CAMPBELL, Senior Circuit Judge:

The three appellants, Christopher Clarke, Brandon Marcell Barden, and Duane Cunningham, Jr., were tried before a jury in the United States District Court for the District of Columbia and were each convicted on various charges relating to drug trafficking. They appeal jointly, asserting numerous errors in the trial. We affirm.

I.

Charges against appellants developed after the arrest of one Darrell Dennis on December 17, 1990. Dennis was arrested for his role in an unrelated scheme to trade cocaine for a machine gun. After his arrest, Dennis

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

cooperated, proposing to arrange a drug deal with defendant Clarke.

Dennis called Clarke's pager from a secure telephone, and a man whom Dennis said was Clarke called back. While the police taped the conversation, Dennis told the caller that he had a customer who wanted to purchase cocaine. Dennis and the caller planned the details of the transaction, which was to occur later that evening. Dennis could arrange the deal ostensibly because he had previously entered into similar deals with Clarke and his confederates, co-defendants Barden and Cunningham.

Dennis and an undercover officer drove to the designated location, a drugstore parking lot in Washington, D.C., while other officers set up surveillance nearby. Dennis wore a hidden transmitter that permitted the officers to monitor his conversations. Meanwhile, another officer watched the 2300 block of Skyland Place, Southeast, where Dennis had told police that Barden lived and where Dennis had spotted a Pontiac Sunbird he said Barden and Clarke used.

After arriving at the drugstore, Dennis again phoned Clarke's pager from a pay phone. A man identified by Dennis as Clarke called back three times and eventually assured Dennis that Barden and Cunningham would be making the delivery. Barden and Cunningham also called. At about the same time, the officer watching Skyland Place saw Barden go to the trunks of two cars, the Pontiac Sunbird and a nearby Plymouth Reliant. He then saw Barden drive away in a Chevrolet Blazer.

Moments later, Cunningham approached the drugstore on foot and entered the back seat of the undercover police car. Soon thereafter, Barden drove up in the Blazer and parked nearby. Cunningham, meanwhile, asked Dennis where the money was, and Dennis pointed to the undercover officer, then standing outside the car. Cunningham showed Dennis the cocaine.

Using a prearranged sign, Dennis signaled the officers that drugs had been delivered. The teams of officers converged on the parking lot and arrested Barden and Cunningham. Two bags containing a total of 223 grams of crack cocaine were found in the undercover car near where Cunningham had been seated. Recovered from Barden were keys that fit both the Sunbird and the Reliant.

That night and the next day, the police obtained search warrants and searched Barden's home, the Sunbird, and the Reliant. In Barden's home, officers found possible drug trafficking items—a pager and a scale—as well as a few documents with Clarke's name, including a receipt for a plane ticket to Washington from Newark. In the Sunbird, the police found an electronic scale, 274.5 grams of cocaine, and certain documents linking Clarke to the car. In the Reliant, the police found over 600 grams of cocaine, two loaded handguns, and a loaded sawed-off shotgun. Over a month later, the police served a search warrant on Clarke's residence in Maryland and found two pagers, a newspaper clipping about Dennis's arrest in December, and a picture of Clarke with Barden, Cunningham, and another individual.

On April 30, 1991, a grand jury returned a five-count indictment against Clarke, Barden, and Cunningham. The indictment charged the three with essentially the following violations, all alleged to have occurred on December 17, 1990:

Count 1: conspiracy to possess with intent to distribute 50 or more grams of cocaine;

Count 2: possession with intent to distribute 50 or more grams of cocaine (the court instructed the jury that this count related to the cocaine found in the Sunbird);

Count 3: possession with intent to distribute 50 or more grams of cocaine (the court instructed the jury that this count related to the cocaine found in the Reliant);

Count 4: carrying a firearm during a drug trafficking crime;

Count 5: possession of an unregistered sawed-off shotgun.

The trial began on August 2, 1991, and lasted five days. At the end of the evidence, the district court granted a judgment of acquittal for the three defendants as to Count 4, the charge of carrying a firearm during a drug trafficking offense. The jury then deliberated for two days. Barden was acquit-

ted of Count 1, the conspiracy, but was convicted on Counts 2, 3, and 5. Cunningham was convicted on Count 1, and acquitted of the other charges. Clarke was convicted on Counts 1 and 2.

We turn now to the various errors assigned in these appeals.

## II.

### A.

Appellants argue that the Counts 2 and 3—consisting of two facially indistinguishable counts for possession with intent to distribute 50 grams or more of cocaine base—were multiplicitous. They also argue that when the district court informed the jury that Count 2 related to the drugs found in the Sunbird and that Count 3 related to the drugs found in the Reliant, it constructively amended the indictment.

■ This court has said that "an indictment is multiplicitous, and thereby defective, if a single offense is alleged in a number of counts, unfairly increasing a defendant's exposure to criminal sanctions." *United States v. Harris*, 959 F.2d 246, 250 (D.C.Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 362, 121 L.Ed.2d 275 (1992). Here, the government argues that notwithstanding the identical language, Counts 2 and 3 relate to different offenses because each pertains to a different cache of cocaine in a different location. One cache was in the Sunbird automobile, the other in the Reliant. Both cars, concededly, were parked close together outside the home of one of the defendants.

■ Whatever the conceivable merit of the multiplicity argument, it plainly fails here as defendants did not preserve it below. "[O]bjections based on defects in the indictment or information," including an objection to the indictment on the grounds of multiplicity, must be raised before trial. Fed.R.Crim.P. 12(b)(2); *Harris*, 959 F.2d at 250–51. As defendants did not object to the indictment until after the jury was selected, any complaint based on multiplicity was waived. Fed.R.Crim.P. 12(f) ("Failure by a party to raise ... objections ... which must be raised prior to trial ... shall constitute waiver

thereof, but the court for cause shown may grant relief from the waiver."). *See also Davis v. United States*, 411 U.S. 233, 242, 93 S.Ct. 1577, 1582, 36 L.Ed.2d 216 (1973) ("the necessary effect of the congressional adoption of Rule 12(b)(2) is to provide that a claim once waived pursuant to that Rule may not later be resurrected ... in the absence of the showing of 'cause' which that Rule requires").

When, at trial, the defendants finally objected, the court overruled the objection and sought to cure any confusion by instructing the jury that Count 2 pertained to the drugs found in the Sunbird and Count 3 pertained to drugs found in the Reliant. The defendants did not object to this instruction, nor did they offer to show cause as to how these two counts, given the clarifying instruction, materially prejudiced them. We can see no prejudice. Only Barden was convicted on both Counts 2 and 3, and even if the charges in these two counts had been consolidated into a single count, the government could have offered the identical evidence to prove his guilt under that count. Barden concedes that, under the sentencing guidelines, his sentence would have been the same had the charges been consolidated into a single count.

The court's instruction, moreover, did not alter the indictment or the elements of any of the charged offenses but merely advised the jury which evidence pertained to which count. Had defendants misunderstood the scope of Counts 2 and 3, so as to be hindered in preparing their defense, they could, prior to trial, have sought a bill of particulars or moved to dismiss. As they did neither, and as they did not object to the court's clarifying instruction, we can only presume that defendants sufficiently understood what the two counts were meant to cover. We see no basis for reversal.

### B.

■ Appellants argue that Count 5 of the indictment, which charged them with possessing the unregistered sawed-off shotgun recovered from the trunk of the Reliant, was improperly joined to the other charges in the indictment. Federal Rule of Criminal Procedure 8(a) allows joinder of offenses in the same indictment if the offenses "are of the

same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). Under this standard, appellants concede that Count 5 was properly joined to the other charges when the indictment was returned: Count 5 was connected to Count 4, charging the defendants with carrying a firearm during a drug trafficking offense, and Count 4 was in turn specifically linked by reference to the first three counts. Nevertheless, the appellants contend that when the district court granted a judgment of acquittal on Count 4, it destroyed Count 5's connection to Counts 1 through 3. Count 5 thus became "retroactively misjoined," and the district court, we are told, was obligated sua sponte to sever it from the other charges.

We note first that appellants never raised this issue at trial. We, therefore, review the district court's alleged dereliction for plain error only. Fed.R.Crim.P. 52(b); *United States v. Thomas*, 896 F.2d 589, 591 (D.C.Cir. 1990).

Appellants cite to one case, *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), to advance the concept of "retroactive misjoinder." But as *Schaffer* indicates, the only issue under Rule 8 is whether joinder was proper at the beginning of trial. If the charge that originally justified joinder is dismissed thereafter, severance is then controlled by Federal Rule of Criminal Procedure 14, which requires a showing of prejudice.[1] *Id.* at 514, 80 S.Ct. at 947; *United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 730, 88 L.Ed.2d 814 (1986).

Accordingly, when the district court acquitted appellants of Count 4, the sole question was whether it was plain error not to sever Count 5. Instead of severing the counts, the district court, without objection, instructed the jury to consider proof of each remaining offense separately and to disregard all evidence introduced in reference to

Count 4. The jury's verdict—acquitting Cunningham of Counts 2, 3, and 5, Clarke of Counts 3 and 5, and Barden of Count 1—indicates that it carefully followed those instructions. Given the fact that this court strikes "a balance in favor of joint trials," *United States v. Perry*, 731 F.2d 985, 992 (D.C.Cir.1984), and that any discernible prejudice is well below the plain error threshold, we cannot say that the district court plainly erred in failing sua sponte to sever Count 5.

## C.

Appellant Barden also cursorily suggests that the district court wrongfully denied his pretrial motions to suppress physical evidence and certain statements he made on the night of his arrest. The district court conducted a two-day suppression hearing, culminating with the issuance of an Order and an accompanying Memorandum Opinion. On appeal, Barden's argument that the district court erred amounts to mere assertion, as he does not identify the errors or specify how the court erred. Barden's present assignment of error flies in the face of Federal Rule of Appellate Procedure 28(a)(5), which requires that briefs "contain the contentions of the appellant on the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on." We, therefore, "decline to entertain [the] asserted but unanalyzed ... claim." (*Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983)).

## III.

### A.

Prior to trial, and pursuant to Federal Rule of Evidence 404(b), the government filed a notice of intent to introduce evidence of the defendants' participation in criminal conduct other than the offenses for which

---

1. Federal Rule of Criminal Procedure 14 provides in relevant part:

 **Relief from Prejudicial Joinder**

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information

or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.....

they were charged.[2] The government proposed that Dennis would testify that he has been involved in at least 25 prior drug transactions with Barden and Clarke, and that Cunningham had also been present in at least two of those occasions. The defendants objected to any such testimony.

After a hearing, the district court issued a written opinion granting the government's request to present the 404(b) evidence. The court found that the evidence of past drug transactions was relevant to show the defendants' "willing association and their intent to act illicitly" on December 17, 1990. The district court also found that the probative value was not substantially outweighed by its prejudicial impact under Federal Rule of Evidence 403.[3] The court acknowledged that the jury might use the prior crimes evidence improperly but that any "misuse" could be minimized "by appropriate jury instruction." The court also found that the government had satisfied the foundational requirements for the admission of 404(b) evidence established by *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), in that there was "sufficient evidence to support a finding by the jury that the defendant[s] committed the similar act[s]."

At trial, Dennis did indeed testify that he had participated in drug transactions with each of the defendants in the past. Among other things, Dennis testified that he was familiar with the drugstore where he and Clarke arranged to meet on December 17 because they had met there before "[t]o make drug sales." Consistent with the government's pre-trial proffer, Dennis estimated that he had previously engaged in 25 transactions with Barden and Clarke similar to the one on December 17—that is, he would arrange transactions for Barden and Clarke and serve as the middleman between them and the purchaser. He estimated that Cunningham had also been present on two of those occasions. Dennis also testified that when the supply of crack cocaine was depleted in Washington, he and Clarke would go to New York and New Jersey to buy drugs. The defendants objected to the introduction of such testimony.

Twice during Dennis's testimony, at the request of defense counsel, the court cautioned the jury about the 404(b) evidence. The first time, the district court told the jury that the evidence was admitted to allow Dennis "to be fully examined," and then twice told the jury it was to use the testimony in evaluating Dennis's credibility. The second time the court instructed the jury about the testimony, the district court again stated that the testimony went to Dennis's credibility. In both instructions, the court reminded the jury that the only offenses in issue were those that were alleged to have occurred on December 17, 1990. Defendants did not object to either instruction.

In its final instruction, however, the district court told the jury that the 404(b) evidence was admitted to show, and so the jury could determine whether, the defendants had the intent to commit the offenses on December 17. The district court directed the jury that if it accepted the evidence it could use it *only* for that limited purpose and that they could not consider it as tending to show the defendants' guilt in any other way. The court did not repeat its earlier explanation that the evidence went to Dennis's credibility. The defendants did not object to this instruction.

2. Federal Rule of Evidence 404(b) reads:

 **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

3. Federal Rule of Evidence 403 reads:

 **Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The appellants make two closely related arguments on appeal. First, they contend that the admission of the 404(b) evidence was in error, as it lacked a proper foundation, went beyond any purpose of 404(b), and was prejudicial. Second, appellants assert that the court's instructions on the issue were improper, confusing, and allowed the evidence to be used by the jury for an improper purpose.

■ Regarding appellants' first contention, the initial question is whether the other crimes evidence was sufficient for the jury to find the conditional fact by a preponderance of the evidence. This standard was made clear in *Huddleston,* where the Supreme Court held that

the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact—[here, that the defendants had engaged in drug transactions in the past]—by a preponderance of the evidence.

485 U.S. at 690, 108 S.Ct. at 1501.

In its pretrial ruling, the district court noted that Dennis easily arranged the drug deal on December 17 and that he had called Clarke and received calls back from Barden and Cunningham. The appellants argue that the district court was erroneously using evidence from the trial case to prove the "other crimes" evidence, when at trial the "other crimes" evidence would be used to prove the trial case.

■ *Huddleston,* however, indicates that a district court need not erect a false wall between the 404(b) evidence and the other trial evidence. When assessing the sufficiency of the 404(b) evidence, "the trial court must consider *all* evidence presented to the jury." *Huddleston,* 485 U.S. at 690–91, 108 S.Ct. at 1502 (emphasis added). The Supreme Court in *Huddleston* specifically *required* the court to assess the 404(b) evi-

dence not only on the basis of the direct evidence on that point but also on the basis of evidence concerning the defendant's involvement in the offense charged. *Id.* at 691, 108 S.Ct. at 1502. Here, the fact that Dennis so easily arranged the December 17 transaction with defendants as well as, of course, his sworn testimony to having participated with them in the other drug transactions, provided adequate basis for the jury reasonably to conclude that the prior "bad acts" actually occurred.

■ With these minimal foundational requirements for introducing the 404(b) evidence satisfied, this court applies a two-step analysis in considering whether the evidence was properly admitted. *See United States v. Washington,* 969 F.2d 1073, 1080 (D.C.Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1287, 122 L.Ed.2d 679 (1993). The first step requires that the evidence be probative of some material issue other than character. *See* Fed.R.Evid. 404(b). The second step requires that the evidence not be inadmissible under Rule 403. *Washington,* 969 F.2d at 1080.

Rule 404(b) specifies a particular use for which so-called "bad acts" evidence is not admissible: proving that a defendant has a general predisposition to commit crimes. *United States v. Moore,* 732 F.2d 983, 987 (D.C.Cir.1984). As this court has stated previously, "[o]nly one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect in character; a man with such a defect of character is more likely than men generally to have committed the act in question." *Id.* at 987 n. 30 (quoting Jack B. Weinstein & Margaret A. Berger, 2 *Weinstein's Evidence* 404–45 to 46).[4]

Here, the testimony concerning the appellants' previous drug transactions was admitted as evidence of the defendants' intent to act illicitly, rather than to establish their character. The defendants were charged, among other things, with conspiracy to possess drugs with the intent to distribute them.

---

**4.** This quotation, since altered to contain more gender-neutral language, now appears at 2 *Wein-* *stein's Evidence* ¶ 404[08] at 404–43 (1993).

In order to establish their guilt, the government had to establish intent in two aspects: that the defendants *purposefully* agreed to act in partnership, with the specific *intent* to distribute the cocaine.

As the Supreme Court has noted, 404(b) evidence "may be critical to the establishment of the truth as to a disputed issue, *especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct. Huddleston,* 485 U.S. at 685, 108 S.Ct. at 1499 (emphasis added). The relevance of this kind of evidence has little to do with the defendant's character *per se.* Its relevance is based rather on a straightforward recognition that " 'the intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time thereto, particularly when the activity involves a continuous course of dealing.' " *Moore,* 732 F.2d at 991 (quoting *United States v. Harrison,* 679 F.2d 942, 948 (D.C.Cir.1982)).

Here, the jury could reasonably conclude that because the defendants had sold cocaine in the past, the cocaine they had in their possession on December 17 was meant to be sold, rather than, for example, hoarded for their personal use. Similarly, the evidence that Clarke, Barden, and Cunningham had worked together selling drugs in the past was relevant to the jury in considering, for instance, whether Cunningham was working alone, whether Barden's appearance at the drugstore was coincidental, and whether Clarke had directed them to make the sale or was seeking to make a separate deal with Dennis. In all of these considerations, character is not what was relevant. Rather, the relevance was based on the common sense notion that people who had previously worked in concert with the intent to sell drugs were probably not intending to save a cache of drugs for their personal use and were probably working together rather than separately.

This court has upheld the introduction of 404(b) evidence to show intent in similar situations in the past. In *Moore,* for example, two individuals were charged with con-spiracy to sell cocaine after they attempted to sell drugs to an undercover police officer and a police informant. 732 F.2d at 983. The informant, who had previously lived with one of the defendants, testified at trial concerning the defendant's prior drug dealings.

This court upheld the introduction of the informant's testimony, saying that "[a]t a minimum, [the testimony] set a context which enabled the jury to evaluate whether the defendants were in fact 'willing and able' to proceed with the drug sale." 732 F.2d at 987. This court called the defendants' drug dealings "forceful evidence that the defendants possessed the necessary ability and desire to sell drugs a scant few days later." *Id.* at 988. *See also Washington,* 969 F.2d at 1080–81 (when defendant was charged with distribution and possession with intent to distribute drugs, evidence of prior drug transaction was probative of intent, knowledge, and plan, and was not offered to show character); *Harrison,* 679 F.2d at 948 (in prosecution for possession with intent to distribute, testimony of defendant's wife concerning defendant's past drug dealing established a course of dealing and constituted proof of, *inter alia,* intent, preparation, plan, and knowledge); *United States v. Manner,* 887 F.2d 317, 322 (D.C.Cir.1989) (404(b) evidence particularly probative where government has alleged conspiracy), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *United States v. Sampol,* 636 F.2d 621, 659 n. 23 (D.C.Cir.1980) (same).

The second step of our analysis turns on the admissibility of the evidence under Rule 403. The district found that under a Rule 403 balancing the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. We review the district court's Rule 403 determinations "with great deference, reversing only for 'grave abuse' of discretion." *United States v. Johnson,* 970 F.2d 907, 912 (D.C.Cir.1992) (quoting *United States v. Payne,* 805 F.2d 1062, 1066 (D.C.Cir.1986)). This court has previously noted that the language of Rule 403 "tilts, as do the rules as a whole, toward the admission of evidence in close cases." *Moore,* 732 F.2d at 989. As a "rule of

thumb," this court has stated that " 'in determining whether "the probative value is *substantially* outweighed by the danger of *unfair* prejudice" it is a sound rule that the balance should be struck in favor of admission when the evidence indicates a close relationship to the event charged.' " *Id.* (quoting *United States v. Day*, 591 F.2d 861, 878 (D.C.Cir.1978)) (emphasis in *Day* ). As those standards could be found to be satisfied here, and as the district court gave a limiting instruction to the jury concerning its use of the 404(b) testimony, we do not find the district court abused its discretion.

We turn finally to the appellants' arguments that the court's instructions were improper and confusing. During Dennis's testimony, the court twice instructed that the "other crimes" evidence was being admitted so the jury could evaluate Dennis's credibility. At the end of trial, in its charge to the jury, the court instructed that the evidence had been admitted so jurors could determine whether the defendants had the requisite intent. The court directed the jury to use the other crimes testimony *only* for that limited purpose.

▮▮▮ Appellants' claim of instructional error comes late, as they did not object to any of the three sets of instructions. Under the Rules of Criminal Procedure, "[n]o party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict." Fed.R.Crim.P. 30. Thus, we review the alleged error under the plain error standard of Rule 52(b), which states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b). To be noticed, therefore, the error must be " 'clear' or, equivalently, 'obvious' " and "must have affected the outcome of the District Court proceedings." *United States v. Olano*, ── U.S. ──, ──-──, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). Furthermore, this court has a duty "to correct a plain forfeited error affecting substantial rights" only " 'in those circumstances in which a miscarriage of justice would otherwise result,' " *Id.* ── U.S. at ──, 113 S.Ct. at 1779 (quoting *Unit-*ed States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)), or if the error " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)).

▮▮▮ We cannot say, under this very deferential standard, that the district court plainly erred. Although the primary purpose of the 404(b) evidence may have been to prove the defendants' intent, as the court later instructed, the evidence also provided the jury a context within which to evaluate Dennis's relationship with appellants and thus weigh the credibility of his identification of Clarke and other testimony. *See, e.g.,* *United States v. Dansker*, 537 F.2d 40, 58 (3d Cir.1976) (previous crimes evidence admissible when it casts light on relationship between key government witness and defendants), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). To be sure, the court's later substitution of "intent" for "credibility" as the purpose of allowing this testimony was confusing, but whatever error inhered in its handling of the matter was not so serious as to engender a "miscarriage of justice" or to "seriously affect" the "fairness" or "integrity" of the trial. *See Olano,* ── U.S. at ──, 113 S.Ct. at 1779.

### B.

Appellants contend that the district court improperly admitted three types of hearsay evidence. They argue first that the court erred when it allowed three officers to testify as to what Dennis had told them about his previous dealings with defendants and about his ability to arrange a drug deal. The appellants also claim that both the tape made from the body recorder Dennis wore and the tape of the evening's police radio broadcasts were hearsay and improperly admitted into evidence.

The police testimony concerned contextual and background testimony by Agent Mark Potter, Detective Alfred McMaster, and Detective William Nealis. Potter testified that the drug deal was set up in Washington, D.C., because that was "where Dennis nor-

mally did his transactions" with Clarke. McMaster testified that he had been called to assist on the case because "apparently a young man had been arrested earlier in the day in Virginia" and McMaster was needed to assist in the surveillance of the undercover drug purchase. Nealis testified that Potter had told him that Dennis could arrange a crack purchase. In each of these instances, Defendant Clarke objected and was overruled. Appellants now argue that the admission of this testimony improperly bolstered Dennis's credibility.

The government argues that the testimony in each instance was not offered to prove the truth of the matter asserted and was proper to give context to the officers' actions. The government also suggests that the testimony was harmlessly cumulative, having been established upon the direct testimony of Dennis.

Appellants also assert that it was improper for the court to admit into evidence the tape made from the body recorder Dennis wore on the night of the set-up. The tape captured Dennis's side of the telephone conversations from the drugstore pay phone, his contemporaneous descriptions of the conversations, his conversations with the undercover detective posing as the buyer, and Cunningham's words when he entered the undercover police car.

The government contends that the various portions of the tape were either not hearsay or fell under exceptions to the hearsay rules. According to the government, Cunningham's words were admissions of a party opponent. *See* Fed.R.Evid. 801(d)(2). Dennis's side of the telephone conversations, according to the government, were "verbal acts" not offered to prove the truth of the matter asserted but were rather evidence of the conspiracy itself. *See* Fed.R.Evid. 801(c). Moreover, according to the government, Dennis's "nearly contemporaneous account" of his conversations with appellants constituted present sense impressions. *See* Fed.R.Evid. 803(1). Finally, the government asserts that insofar as the tape reflects the words of the undercover officer, they were not offered to prove the truth of the matter asserted but were instead offered to provide context.

Appellants' last hearsay challenge is to the tape of the police broadcasts during the surveillance and attempted sale. Appellants claim that the tape inappropriately bolstered the credibility of the police officers who testified at trial. The government points out that the appellants failed to object to the tape's admission, so this court should review only for plain error. The government argues that the tape was admissible in any event, both as nonhearsay identification testimony, *see* Fed. R.Evid. 801(d)(1)(C), and as present sense impressions, *see* Fed.R.Evid. 803(1).

In evaluating the admission of this testimony, this court will reverse the district court's evidentiary rulings only if the rulings were an abuse of discretion. *See Carey Canada Inc. v. Columbia Casualty Co.,* 940 F.2d 1548, 1559 (D.C.Cir.1991); *see also Malek v. Federal Insurance Co.,* 994 F.2d 49, 53 (2nd Cir.1993) (review of application of hearsay rules is for abuse of discretion); *Precision Piping and Instruments, Inc. v. E.I. du Pont de Nemours and Co.,* 951 F.2d 613, 619 (4th Cir.1991) (same); *Larez v. Los Angeles,* 946 F.2d 630, 641 (9th Cir.1991) (same).

 Even if we were to conclude that the admission of the testimony was erroneous, that would not end our inquiry, as we would then need to decide whether the error was harmless. Fed.R.Crim.P. 52(a). In making such a decision, we must "determine 'whether the error itself had a substantial influence' on the verdict." *United States v. Patrick,* 959 F.2d 991, 1002 (D.C.Cir.1992) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). That is, "we must determine 'with fair assurance . . . that the judgment was not substantially swayed by the error.'" *Id.* (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1239).

 We cannot say that the district court abused its discretion in admitting this evidence. The admission of the police "background" testimony was questionable, although it can be said to show the state of mind of the officers. It was harmlessly cumulative in any event. As to the tape from the body recorder, the government is correct in suggesting that the various portions of the tape were either not hearsay at all or fell

within the specified exceptions to the hearsay rule. The tape of the police broadcasts was arguably admissible as identification testimony and as present sense impressions. Its admission was certainly not plain error.

### C.

In its case in chief, the government presented Detective Dwight Rawls of the Metropolitan Police Department as an expert in the packaging of, and distribution techniques for, controlled substances. There was no objection to his qualification as an expert. Rawls testified that in his opinion the quantity of cocaine seized from each of the three sources at issue—the undercover car, the Sunbird, and the Reliant—was consistent with distribution and not with personal use. Rawls described the typical organization of a drug distribution network. He also rendered an opinion about the street value of the cocaine recovered from each location. The defendants objected to the testimony concerning the value of the drugs, arguing that it was irrelevant and prejudicial. The court overruled the objection.

Also, in response to a hypothetical question tailored to the facts of the case, Rawls gave opinion testimony about the organizational structure of the charged conspiracy and the role played by each of the alleged conspirators. In part, Rawls testified that it would not be unusual for the person who was originally contacted by phone to not appear at the time of the actual delivery, as he would likely be supervising the operation from elsewhere during the actual transfer, the most dangerous part of the operation. Rawls testified that based on the hypothetical, the two individuals who arrived at the scene of the transfer would be, in his opinion, "lieutenants or people who [were] actually responsible for distributing the drugs within that organization or group." The defendants objected to this testimony, arguing that the government was asking Rawls, in effect, to state an opinion as to the defendants' guilt, thereby improperly encroaching on the role of the jury. The court overruled the objection.

Appellants now argue that Rawls's testimony based on the hypothetical was improperly admitted under Federal Rule of Evidence 704(b), which prohibits an expert from testifying that the accused had "the mental state or condition constituting an element of the crime charged." [5] In addition, the defendants continue to press their argument that the testimony concerning the value of the drugs seized was prejudicial and irrelevant. Lastly, though that did not object on such grounds at trial, defendants assert that Rawls's testimony about the typical organization of a drug distribution network was prejudicial and irrelevant.

■ Our review of the district court's rulings on Rawls's testimony is circumscribed. As this court recently noted, "[a] district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when discretion has been abused." *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 567 (D.C.Cir.1993). Rule 702 permits expert testimony that "assist[s] the trier of fact to determine a fact in issue." Fed.R.Evid. 702.

■ While aspects of the matter are close, we are not persuaded the district court abused its discretion here. Rawls's testimony in answer to the hypothetical was a description of the likely roles of the described individuals, something "not within the common knowledge of the average juror." *United States v. Boney,* 977 F.2d 624, 628 (D.C.Cir.1992). It is true that this court has expressed discomfort with an expert witness testifying "directly as to a defendant's guilt or innocence." *Id.* at 630. Rawls's testimony skirted that line fairly closely. But Rawls's testimony, like the testimony of a similarly credentialed expert in *Boney,* can be said to have "at most matched particular

---

5. Federal Rule of Evidence 704(b) reads:
 **Opinion on ultimate issue**
 . . . .
 (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or

inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

defendants and their actions with paradigm roles in an illegal enterprise, [and] not [to] amount to a direct opinion on the defendants' guilt." *Id.* at 631.[6] *Cf. United States v. Mitchell,* 996 F.2d 419, 421–22 (D.C.Cir.1993) (erroneous to allow expert to testify that certain packaging of crack cocaine meant that person possessing the drugs had "intent to distribute").

■ Appellants' arguments that the court abused its discretion in allowing Rawls to testify concerning the value of the drugs seized and the typical organization of a drug distribution network are without merit. The value of the drugs was relevant to the question of whether the defendants possessed the drugs with the intent to distribute them. The description of a typical drug network was relevant to provide context to the jury in evaluating the offenses charged. *See Boney,* 977 F.2d at 628 ("[t]he operations of narcotics dealers repeatedly have been found to be a suitable topic for expert testimony...."). The district court could reasonably assess Rawls's testimony on these topics as not, in any event, unduly prejudicial.

### D.

■ Appellant Barden argues that the district court erred when it denied a motion for a mistrial he made during the government's redirect examination of Detective Nealis. Barden made the motion when Nealis testified as to certain statements Barden made to him about other drug dealers after his arrest. Barden sought such a remedy because some of Nealis's testimony concerned evidence that Barden had relayed to Nealis on the condition that it not be used against him at trial in the government's case in chief.

The immunized information was, to all appearance, revealed innocently. On direct examination Nealis testified about his role as a surveillance officer on December 17, the service of the various search warrants, and appellant Barden's non-immunized post-arrest statement. On cross-examination, Barden's counsel questioned Nealis about information

he had received from Dennis at various times on and after December 17 concerning Dennis's relationship with various drug dealers. The apparent purpose of this cross-examination was to cast further doubt on Dennis's credibility and to suggest that the police had been less than aggressive in their efforts to follow up on information Dennis had provided.

On redirect, the prosecutor asked Nealis about the efforts that had been made to pursue the leads that Barden had provided concerning one individual in his post-arrest statement. On receiving an answer, the prosecutor then asked: "Was there any other follow up done with respect to the information that Mr. Barden provided you on the night he gave the statement, sir?" Nealis said that he had, explaining that the police had determined the identity and whereabouts of one Charles Robert Stewart. Nealis went on to say that Stewart lived in New Jersey and that he had relayed information about Stewart to New Jersey officials. Nealis continued, saying: "Since they were ferrying drugs, we were hoping that they would ..."

At this point, Barden's counsel requested permission to approach the bench. He explained to the court that, even though the prosecutor's question had related to the non-immunized post-arrest statement, Nealis's answer related to the *immunized* sessions, as the information about Stewart had not been offered in Barden's statement on December 17 but in an immunized session at a later time. Barden's counsel therefore objected and moved for a mistrial. The court sustained the objection and prohibited further inquiry into the information Nealis had gained from Barden. The court denied the motion for a mistrial but asked Barden's counsel if he wanted the court to offer a limiting instruction. Barden's counsel declined.

The prosecutor acknowledged at the time, and the government concedes on appeal, that the testimony was in violation of the agreement between Barden and the government.

---

6. We also note that, as in *Boney,* the defendants failed to object to the hypothetical questions on the basis of its prejudicial impact on the jury and did not ask the court to exercise its discretion under Rule 403 to exclude the testimony as unduly prejudicial. *See Boney,* 977 F.2d at 631.

Appellant Barden concedes that the introduction of the evidence was unintentional but argues that it was nevertheless prejudicial, as it linked Barden to people identified as drug dealers. The government maintains that the evidence against Barden was compelling, and that the wrongful admission of Nealis's comments did not add materially to the government's case.

A mistrial is a severe remedy—"a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *United States v. Anderson,* 509 F.2d 312, 325 (D.C.Cir.1974) (footnotes omitted), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975). In deciding whether a mistrial is warranted, the "single most important factor" for the district court to consider is the extent to which the defendant was prejudiced. *United States v. Tarantino,* 846 F.2d 1384, 1413 (D.C.Cir.), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988). The district court's decision not to grant a mistrial is reviewable only for abuse of discretion. *United States v. Williams,* 822 F.2d 1174, 1188 (D.C.Cir.1987).

■ Given all the circumstances, the district court did not abuse its discretion in denying Barden's motion for a mistrial. Nealis's mention of Stewart was brief and, it appears, inadvertent. It took place after Barden had already been linked to several individuals who were identified as being involved in drug trafficking. The reference to Stewart did not significantly advance the government's case nor so prejudice the jury that it was an abuse of discretion for the district court to deny the motion.

## IV.

■ Appellants also contend that the prosecutor, in her closing argument, referred to previous crimes evidence in an improper manner by saying that "the company you keep says a lot about you." Defendants objected to the remark as improperly suggesting that conspiracy could be inferred from one's associations. The district court offered a cautionary instruction, advising the jury "that mere association of alleged conspirators without evidence of participation does not permit an inference of guilt." The court then instructed the jury to disregard the remark.

The court's corrective instructions were appropriate and promptly rendered, so as to mitigate any prejudice defendants could conceivably have suffered from the prosecutor's ill-considered comment. To find reversible error, we would have to conclude that the jury disregarded the court's instructions. There is no reason to assume that it did so. Rather, in these circumstances, it seems entirely reasonable for us to heed the more usual assumption of the law that the jurors followed the court's instructions and disregarded the remark. *See Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1706, 95 L.Ed.2d 176 (1987).

## V.

■ Finally, appellant Clarke maintains that his sentence was improperly calculated. The district court at sentencing attributed to Clarke all the cocaine recovered by the police as "relevant conduct" under the Sentencing Guidelines and determined as well that Clarke was the leader of the conspiracy for purposes of sentencing. *See* United States Sentencing Commission, *Guidelines Manual,* § 1B1.3 (Nov.1991) (defining relevant conduct); *id.* at § 3B1.1(c) (allowing for enhancement of two points in offense level for leaders of a conspiracy). Clarke argues that the district court did not make the proper findings to allow these calculations and that the factual findings it did make were contrary to the evidence.

We disagree. The district court found that there was "no question that Mr. Clarke was a leader of this conspiracy [and] that the conspiracy included the drugs in the Plymouth Reliant as well as the other drugs." These determinations were based on sufficient evidence heard at trial, and we may disturb them only if clearly erroneous, which they were not. *See* 18 U.S.C. § 3742(e); *United States v. Lam Kwong–Wah,* 966 F.2d 682, 688–89 (D.C.Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 287, 121 L.Ed.2d 213 (1992).

*Affirmed.*